Mr. Farley, Good morning, Your Honors. There are some circumstances in which bankruptcy law just does not play well with other substantive areas of the law, and this is one of them. We are talking about the impact of bankruptcy on a surety bond triangle, and let me review that real quickly. In 2017, an obligee named Hillcorp and a principal named Falcon and a surety named Argonaut entered into a three-party contract, and the way it looks is this. Hillcorp, Argonaut, and surety as a secondary obligor also owed a duty of plugging and abandonment to Hillcorp. But before Argonaut would undertake that obligation, it insisted that Falcon execute an indemnity agreement in favor of Argonaut. You do know the facts. I know they're tangled. We know. Okay. I felt the need to at least set out that. Yeah. Okay. Now, my gripe here is that the surety triangle here was handled in such a way that Falcon remains obligated on the Hillcorp bond. Argonaut also remains obligated on the Hillcorp bond, but the third leg of the triangle, the general indemnity agreement, has been stripped out of the triangle, and that has a couple of effects. Number one, Argonaut cannot look to Falcon for reimbursement in the event of a loss. Number two, Argonaut cannot insist on additional collateral, as it has tried to do here. And number three, Argonaut cannot get premiums paid on the bonded issue. To me, that is a violation of the cum honore principle that applies both in the context of executory contracts and also as a matter of common law. Falcon, in effect, has taken the good parts of the contract and left the bad part of the contract off the table, at least as far as Argonaut is concerned. If the concern, though, is sort of ruthlessly under the bankruptcy code to protect the estate, why would the estate ever want to assume this contract, knowing that your client has irrevocably posted the bonds? The question is whether Falcon continues to want to do business with Hillcorp and its other alleges. And in the first day motion filed by Falcon, the surety bond program motion, the Falcon decided that this arrangement, the surety bond program, was absolutely essential to its business. I agree that, no, they did say that over and over again, which suggests that they thought that it would benefit the estate, it's an administrative expense. But I'm still, let me step back again. Do you accept the countrymen test with a little adjustment? Are you urging what courts are calling the functional results-oriented test, or are you coming up with some other test, and can you point me to any court other than that one bankruptcy court? So what's the test you would have us apply to say these surety bonds are executory? Let me talk about that, about countrymen for a minute, if I talk too much. No, no, no. You're going to inform me, but I'm going to maybe start with, do you accept the countrymen test as modified, or do you want to offer us a different test? I accept the countrymen test as modified as a guide to interpretation. I do not accept it as black letter law, and I do not accept it as a mathematical formula. In other words, it's possible to apply countrymen, but in a malleable or a flexible way. For example, in the Bill Disko and the Tempnology case, the U.S. Supreme Court did not directly adopt the countrymen test, but instead said that an executory contract was a contract in which performance was due on both sides. Now that's similar to countrymen, but it leaves out parts of countrymen, such as the material nature of the obligation that doesn't have to be, that hadn't been performed. Likewise, this Court in the Ultra Petroleum case, if I've got that name right, on March 27th, defined or referred to executory contracts, just as the Supreme Court did in Bill Disko. There is performance due on both sides. Now talking about countrymen specifically, I'm sorry. No, no. Keep going. Talking about countrymen specifically, let's talk, let's, countrymen refers to an article written in 1973 by a great Harvard law professor named Burr and Countryman. Professor Countryman's objective in writing the article was to summarize and synthesize cases that had been decided up to 1973 by, under the Bankruptcy Act. Now, the bankruptcy code itself was adopted five years later, in 1978, and it does not adopt the countryman test. In fact, it does not define executory contract. You can look through the definition section of that. That's all in your brief. And it's clear. I'm not meaning to interrupt you, but so where does that get you? Because you aren't embracing the functional test. So you would say here the surety bonds are executory because both parties still owe obligations even to third parties? Is that? The rule I would make, if I were making a rule, is that where the surety and the principle continue to owe obligations to the obligee, and the principle has not fulfilled its indemnity obligations to the surety, that is an executory contract. So you're knocking out the second condition of the countryman bilateral, because you do agree but disagree if you don't. Your client has already posted pre-petition these bonds. Yes. So any breach by the debtor, you're still, you still have to, those bonds are still owed. The breach by the, a breach by the debtor of its indemnity agreement does not release me from the bond, but it sure does help, because we're entitled to get collateral from Falcon to secure us against loss on the bond, and if we can get enough collateral from Falcon on the bond, in effect, the obligation is, I won't say it's fulfilled, but it certainly is less of a sting. And that's what we're really talking about here, is whether we can get collateral to support the potential default by Falcon on its plugging and abandonment obligation to ILCORP, a $10 million bond. There's also the matter of premiums. If this were a YouTube video, the title of it would be How to Get Free Surety Ship. I don't think it would go viral, but nonetheless, that would be the title of it. And that is, that is, again, a violation of what I think the bankruptcy code is attempting to do. But both sides, to the extent they owe performance to the other, it's all contingent, yes or no? Yes. It's contingent on their, it's contingent on Falcon not complying with the plugging and abandonment and other related conditions in the ILCORP, defined in the ILCORP bond. I'm sorry, I'm not sure if I, no, you, you've answered a lot. I, I, yeah. Keep going, because you want, you, you both, both sides are going to know this area of law better. But, now, you're on, the court this morning has asked counsel in other arguments, what's the best case? Or what case do you rely on? Well, unfortunately, this is the leading case. Whatever your honors decide will be the leading case on the question of how a surety bond triangle passes through bankruptcy. There are about half a dozen lower court, bankruptcy court or district court decisions discussing the issue, but they're all in different factual circumstances. The best one for me is Evans Product. The worst one for me is probably James River, although I think I can distinguish that. So there is not much to go on in this area. It just doesn't come up that much in terms of . . . Looking to benefit the estate. So it's sort of back to my first question. Why would the estate ever want to assume this if all that's left is obligatory performance to the obligees? Well, I guess, I guess when you say this, I'm not sure if you're referring to the obligation under the bond. Your obligation under the bond. Well, clearly in this case, in order to keep its business operating, Falcon wanted to maintain the bond in existence because if it hadn't, there would have been consequences in terms of its business collapsing. But it is. It's owed irrevocably. Yes. So they've got that. Yes. So I'm not sure why they would want to assume . . . Oh, I see what you're saying. I see what you're saying. The starting point there is that in the plan, there's a catch-all provision in the plan, and not to repeat what you've seen from my brief, but there's a catch-all provision in the plan saying that all contracts not expressly rejected are assumed. Now if this is an executory contract, this triangle is an executory contract, it has been assumed by Falcon. And whether that was a good judgment or a bad judgment by Falcon, I can't say. Well, that gets us sort of into the sort of textualist problem of unless it's a financial accommodation. Well, the financial . . . do we want to go into the financial accommodation thing right now? I don't know if we want to go there yet or not. I mean . . . Okay. I'm learning from what you're saying, so don't if that's a jump. If you were going to finish your thought on another point, but I would have, just to get you to appreciate the candor, that would seem to be an uphill battle that you can say it was assumed by consent. At least we'd be splitting with, what's the case, Sunrunner, wouldn't we? The Sunrunner case . . . let's talk about Sunrunner. Sunrunner was the Ninth Circuit Bankruptcy Appellate Panel, and it stands alone, to my knowledge, in saying that even with consent, a financial accommodation cannot be assumed. The other cases in the area, such as T.S. World Industries and Charrington, basically say that the purpose of the financial accommodation provision of Section 365 is to protect lenders from having to continue their loan relationship with a post-petition debtor whom they no longer consider to be a good credit risk. I think that's the better reading, frankly. Sunrunner was decided in a situation where the issue came up at the very front end of the case. The major creditor of Sunrunner objected to the assumption of a financial obligation. That's not normally the case. There's no objection here, certainly, and Argonaut has, at least by silence, consented to the assumption of a contract, even though it is a financial accommodation, which we agree. Okay. Dodd, do you remember, he had a paragraph, Judge Dodd had a paragraph that I'm sure you can explain. He faulted you for not objecting to the confirmation and suggested also that you could have moved for temporary allowance under, what is it, 3018? Well, I'm kind of . . . I wasn't sure I understood that. I'm being shot from both sides because I didn't object, Argo didn't object, that bad consequences befall me. On the other hand, because I didn't, even though I didn't object, I can't take advantage of the financial accommodation assumption. So one of those two things is wrong, and the way I would put it is we consent to the financial accommodation by not objecting to the plan or the disclosure statement or the surety bond program motion. So now again, I'm not sure if I'm answering your last question. No, no. I think I understood. It was just a, it was the tail. You have two minutes. You say what you want to say. Okay. The other issue is passed. I've got two opportunities to win this case. One is for the Court to hold that the surety bond triangle is an executory arrangement and was, in fact, assumed by the debtor in its plan. The other option, based on Stump v. O'Connor out of this Court, is that the surety bond triangle passed through the bankruptcy unaffected. And actually, that's probably the most logical result, because it— Even if non-executory. Even if non-executory, which I think is part of the holding in Stump v. O'Connor, unless my memory is failing me. So there's a lot to be said for using passed through here. It was not, the plan does not make crystal clear what the intentions are with respect to the surety bond triangle, and I consider it to have gone through the bankruptcy unaffected. And that would leave everybody in the place they were back in 2017 before the filing of  Thank you, Your Honor. Is that last argument available to you in light of ASARCO? Do you remember? I'm drawing a blank on ASARCO. I apologize. Maybe I'm mis-citing it. And it's going to be embarrassing for me to find it. ASARCO v. Montana Resources, non-executory contracts are not subject to assumption or the Ride-Thru Doctrine, 5th Circuit, 2017. It may not have been in the briefs, so if it's not, it's just a very helpful law clerk having pointed something out to me. But unfair for me to throw it at you. While I'm listening to Mr. Phillips, I'll have one eye on the ASARCO case and get back to you in my rebuttal. Judge Gerald, do you have any questions? Thank you. Judge Higginbotham? Mr. Phillips? May it please the Court, thank you, Your Honors. We're here. You've read the record. You know the facts. We will stand with the initial proposition that there is, in my experience and I don't think in legal experience, a basis to assume an indemnity agreement. That would be all that we received by assuming the bond indemnity agreement. And we have the countryman definition, adopted by the 5th Circuit, we cite the case law, I mean, Rex Coe . . . I guess just factually, you don't deny that you, at the outset, you were strongly urging that it should be assumed. This was . . . No, no. No, no, Your Honor. We were strongly urging that we should be allowed, we did not think it was in the ordinary course of business, which you can pay . . . I thought your statements were this is necessary for our ongoing business. . . . that it may be necessary and we want to go ahead and pay the bond premiums that were passed due pre-petition. But doesn't that indicate that this was to the benefit of the estate? Well, I will tell you this, Your Honor. It indicated we got the case a month before we filed the bankruptcy case. This was to avoid a dispute about whether or not we had a committee, we had various and sundry balls in the air, and we wanted to buy peace through the bankruptcy process. But if you read the motions that we filed and the reservations that are in the motions we filed, there is never a statement that the bonds are necessary to the continued operations. And it is clear that notwithstanding Orgonat's argument to the contrary, the Orgonat bonds to . . . let's talk about Hillcorp, because there are two bonds to private parties. Hillcorp's the big one. Hillcorp's the big one, $10 million-something, Chevron $350,000. The two little government bonds are, I don't know, $100,000, not much, $125,000, $150,000. But we never said they were. We said they might be, and we wanted to go ahead and pay them, and the lender agreed to provide us post-petition finance to pay them so that we didn't have to fight to issue administrative expense priority up at that point. I will tell you this, I'll never do that again. But that was just to buy smooth sailing for the first few weeks of the case, which, by the way, generated a lot of rough and high waves that we had to fight through to get to planned confirmation. So we never took the position, and we have never taken the position, that the entire bonding program was necessary to the continued operations. There are part of bonding that are necessary in the operations, but it's simply the two government bonds. The private bonds, notwithstanding the suggestion by both Orgonat and Amicus that the private bonds are necessary, they are not. We don't care what happens to the private bonds. We bought mineral properties, and as part of that sale, Hill Corp. said to us, we're selling you long-operated, long-producing properties, and we want you, because we're in the chain of title, to give us a bond. And we went out and found a bond from Orgonat, and the bond is fully vested. It cannot be reduced. It cannot be terminated to limit liability as of a certain date. It is there. They're holding about $3.2 million in collateral, and they were paid the premiums. When the premiums came due, we didn't pay the premiums, and then they made a demand for the collateral, and we said, we're not posting the collateral. Why? Because the contracts were not executory and were not assumed. And the countrymen definitely— Can I interrupt you at the outset just to buy peace? Yes, sir. Go ahead. So, the countrymen test— Works perfectly. It works perfectly here. It works perfectly. There is no duty owed from Orgonat to Falcon. Right, but that is squeezing it into a bilateral contract. Let me finish my question. Let me create a question for you. So, what court that has applied the countrymen test has done it with the most analysis of a multi-party contract, or are we sort of the first? I think you may be the first here. So, you say it's a perfect fit, but what's— I think it is a perfect fit. Okay, go ahead. I think it is a perfect fit. There's no duty owed to Falcon by Orgonat. Orgonat really owes a duty to Hillcorp. Hillcorp owes no duty to Orgonat. Orgonat's stuck. We owe a duty, but we cannot excuse performance by Falcon of its duty to—performance to Orgonat of its duty to Hillcorp. Whatever breach you do, they still owe— We cannot affect its obligation. And so, what we have here is we have a situation where the bond is outstanding. Orgonat had the ability early on to collateralize its position. It didn't. It didn't seek collateral in the bankruptcy case, notwithstanding that the bond premiums were in default, and we were in bankruptcy, so that it seems to me like that's a pretty good moment in time to say, you know what? We need some more collateral here because, A, you're in default, B, you're in bankruptcy, C, you're saying that your property's worth $25 million and the senior secure debt is $42 million, and you've got $10 million of allowed claims, and D, and here's why they did it. No one's called us on the bond. We don't want to say anything because we don't want to be in the mix. No one's called us on the bond. We've not been asked to do anything. So, we go through the bankruptcy process, and Countryman works fine. We can't excuse their performance. They don't owe us any performance. They have bought, paid for, gone out and got sufficient basis upon which to issue the bond, and it is done. That part is not executory. It is a done contract. So, the only party with obligations here is Falcon to Argonaut. I mean, Falcon to Argonaut and Argonaut to the obligation of the bond. Wait, sorry, just elementary. What does Falcon still owe Argonaut besides the payments? Nothing. I thought you said they do have an ongoing duty to Argonaut. Well, they have the payment obligation that was in from day one, and that's it. They don't have any reporting. They don't have anything. Now, Hillcorp will send them a demand, and Hillcorp, after all the properties are finalized and cleaned up and everything, then Hillcorp owes a release of the bond, but that's not a condition that can be breached and excused performance. That's after everything's been performed. So, Your Honor, what we have here is we have kind of a curious alignment because Professor Westbrook came out with a functional approach to kind of deal with the fact that bankruptcy courts were, he thought, messing up the countryman approach. Countryman works fine as long as you don't say that if I'm going to reject a contract, I get all my stuff back. That's been the real focus of countrymen, and as long as you don't focus on spending $400 million litigating whether you can reject a non-executory contract. I call that vampire rejection. You can reject a vampire. It's just what happens next. The vampire tears your throat out. It doesn't matter that you've rejected it or not. In a loan agreement, you can reject a loan agreement, but that doesn't matter. The claim process matters. So where are we with respect to Hillcorp, the initial, you know, we owed indemnity to Hillcorp. We owe indemnity to Argonaut. We're in exactly the same position with respect to both of those. Hillcorp filed a zero contingent unliquidated claim. Argonaut filed a $10 million claim that said it was zero. The court has disallowed both of those claims. So we have no more obligation to Hillcorp. Hillcorp's claim was never estimated. It's zero and disallowed and discharged. Argonaut's claim, zero, disallowed, discharged under 502E. They didn't appeal that part of Judge Don's order. They never came and wanted an estimation. They never came and made a collateral demand. They never came and said, we consent. In fact, if you look at their proof of claim, the proof of claim mentions nowhere non-assumable and assignable without consent. It mentions non-assumable and assignable for reasons, among other reasons, 365C2. So our position, Your Honor, is that this contract, this type of contract, and I got to be and I do want, I've got ten minutes, I think I can do it. I do want to distinguish this type of contract from a financial accommodation executory contract because the case is cited. We'll get to that. Well, a bond is a financial accommodation. I guess so, Your Honor, but the question for me is a little over my head. Is a non-executory bond and indemnity agreement a financial accommodation that is dealt with under 365C2? I don't know the answer to that. Is this getting to the pass-through argument? It would be getting to the pass-through argument. We say that it's a non-executory contract, and I think 365C2 cannot generate a pass-through because if it applies to non-executory financial accommodations and those pass-through because it can't be assumed, then there's no discharge. You'd have to assume all the loan or reject all the loan. You can't reject what you can't assume. So our point is that this rises or falls, and we went in the alternative. Judge Jackson didn't go in the alternative. Judge Jackson said this is not an executory contract. It's not an executory contract. Tripartite means nothing because even between Argonaut and Hillcorp, it's not executory. Okay, I'm trying to remember Judge Dodd, Judge Jackson's rulings. You're right. He stopped there, but then at the end he said Judge Dodd hadn't reached a third point. Am I remembering that correctly? He did, and Judge Dodd said that he didn't need to reach the third point to pass through because he found it was non-executory contract and pass-through applies to executory contract. Is that a SARCO or am I making up that case name? That is a SARCO. Okay. That is a SARCO. Okay. And there's never been any—it's National Gypsum too. We cited both of those cases, I believe. But there's never been an opinion out of the Fifth Circuit, and it would have to be like that because— Is the last time we really addressed what's an executory contract in the bankruptcy context, Judge Higginbotham's decision in Provider Meds? That's the last one that we— And that was not a multiparty contract, was it? No. We're not running from the fact that the multiparty contract is not something that we deal with every day. But I will tell you that this bond is why this is non-executory. The bond is done. There is a described universe of claims. This is not a bond. Well, and both of you are very confident and you know each other, so what's your answer to the amicus filing of the industry saying this is— Oh, I've got an answer to the amicus filing. Okay. I knew you would. The amicus filing, first of all, raises new issues that weren't raised on appeal. Okay. But let's assume we want to get this right. Well, Your Honor, that's fine. But not only were they not raised on appeal, Falcon stipulated at hearing that it owed no duty to us. And then Falcon said, when Judge Dodd said, we will do a little briefing, but I don't want to yield the world, so Falcon's counsel interrupted, and it's on the record in the transcript, there can be no new issues briefed. Okay. But you must have insight into what the amicus filing— I do. I read it, yes. And we said it doesn't work because you can't raise an issue that was not raised and, in fact, contravened by the party. Is your answer to the surety bond folks that they should get more collateral early on? Sir? What's your answer to their industry concern? I don't care about their industry concern. Okay. So you don't care, you have no answer to it. Oh, I have an answer to it. I thought it was that they should get and secure collateral early on. Oh, early on in the issuance of the bond? Yes. Oh, absolutely. Absolutely, they should get—or not issue the bond. Our bond premiums that were paid over a number of years were $300,000 a year. They were paid, and the problem is what you boil their analysis down to is we wouldn't have issued the bond if we didn't think we were going to get paid all of our premiums and have the right to demand collateral at any time. Well, how many people would argue that very same thing, which is nothing more than an argument that we wouldn't have issued debt unless if we thought you would go bankrupt, but the bankruptcy code is out there and you can't preclude people from going bankrupt. So our position is they had the ability at inception. They got what they got. They had the ability prior to bankruptcy to make a demand. In fact, had they been being straight, they would have made a demand in the bankruptcy court, and they would have said we want this assumed, but we want adequate assurance of future performance. The problem with assuming financial accommodations and assuming any contract, if you're the non-debtor party, is how much millions of dollars have been spent over what provisions aren't enforceable. Will you say that again? Millions and millions of dollars are spent over what provisions in executory contracts are not enforceable. Is this really an ipso facto clause that even if you assume you get to get out because I get to say you don't have enough tenants or I get to say that it's a material misadventure or I get to say that you don't have enough collateral? The problem with assuming contracts is the non-debtor party can be, in its estimation, deprived of ordinary state court default rights that the courts have said, we're not going to allow that provision to remain because it's a prohibited provision. And so the problem that we have here, judge and court, I'm sorry, is that we have a bond that is ensconced. Until the leases are terminated, that bond stays. That was their deal. We didn't make them do it. They're the bond company. They know everything. They made a collateral analysis. They took the collateral that they needed to take in their estimation. Now the idea that post-confirmation, when a first lien lender of $41 million-plus takes equity and the $10 million of unsecured debt takes warrants, which is a diluted part of equity that they have to buy into at a value of $41 million for the company, when the financial analysis shows the company might be worth $20 million, do we think that that plan would have gone forward if anybody thought we were assuming this bond obligation where the next day or the next six months the bond company could say send me $7 million? It wouldn't have been a plan. I got an objection from the committee, an objection from me, an objection from the lender. Nobody would have said we're going to allow you to assume an indemnity obligation that the bond company could claim as an administrative expense and that would allow the bond company to make a claim for $7 million, as it's done now, and if we don't pay, it sues for $7 million. For what? We don't care what happens to the bond. We do not care. And we sent, record shows, we sent the pittling payments to the government bonds. I don't know what happened because it's irrelevant to me. They may have kept the money and kept the bonds in place. Argonaut is in the following position. It can call the obligees and say we're canceling our bonds, and what happens with Hillcorp, Hillcorp says send me $10 million, whatever the penal sum is. What happens to Chevron? Chevron says send me $10 million. I'm not replacing a bond. And if the government says send me the money and then tells me I've got to replace a bond, I'll replace a bond. Now, I've got a minute. On the 365C2 question, they're asking you to inject consent into a non-consent provision, immediately below a subsection that provides for assumption of a particular kind of contract with consent or not without consent. You can't do that. They have admitted that that would extend to implied consent that you could, in these big bankruptcy cases, catch any number of financial accommodation parties and hurt both the financial accommodation parties and the debtors, depending on whose office is getting gored. Is the debtor assuming an indemnity agreement? Debtors aren't in bankruptcy because they've been too smart at every turn. So it's a protection of the estate. And I will tell you that there was no evidence presented in the record at the confirmation hearing, judge, court, that had anything to do with that we need to assume these contracts. We appreciate it, and thank you very much. Okay, you're going to start with the vampire? I think I'll let vampire slide. It is news to me that Falcon is saying that it has no further obligation to Hillcorp under the bond. It would probably be news to Hillcorp also. But if your honors are going to write an adverse opinion to my position, I would ask you please to say that the Hillcorp bond has been discharged. We'd be happy to see that. Now, as far as asking for collateral, collateral is a moving target. Sometimes the debtor's position gets worse. Sometimes it gets better. In 2017, at the same time as we issued the bond, we requested and we got $3.2 million in collateral. So we're not as stupid as we look. It is after the bankruptcy that we made an additional demand to be put in, to be given collateral for the full amount of the Hillcorp bond and the other bonds, which are much smaller. And the question basically here is whether that demand can go forward after the conclusion of the bankruptcy. Going back to the point about Hillcorp, the disclosure statement, which I don't have in front of me, distinctly says that the surety bonds are going to remain in place. And it would seem to me that if Hillcorp did not say, I can't speak for Hillcorp, but if they didn't say anything at that time, it was because the disclosure statement said, you don't have to worry about it, the bonds remain in place. Judge Dodd said that was comforting to you. Oh, it was comforting to me. There were a lot of things in the record that were comforting to me, except for the ending. We had the surety bond program motion, which says the surety bond program is essential. We can't walk another step down this road without it. Then we had the disclosure statement, which basically says the same thing as the surety bond program. And then in the plan, we've got a statement that any executory contract not specifically rejected is deemed assumed. From the point of view of my in-house claims counsel sitting up at Argo, that sure looked to him like he was protected under the plan and protected in the bankruptcy because of the, how shall I put it, assurances given by the debtor in its pleadings. Now, when we actually asked for the collateral after the bankruptcy, rug goes out from under us, we're told that our debt was actually discharged in the bankruptcy, and here we are. And unless the court has any questions. I'm sorry, go ahead. No, no, no, go ahead. No other rebuttal points? At a very simple level, do Collier or Norton, any of the leading treatises speak to countrymen applied to a multiparty contract? To my knowledge, no, Your Honor, and believe me, I've looked. There is a footnote in Countryman, which is highlighted in the briefs, talking about multiparty contracts. But there are six or seven reported bankruptcy court and district court opinions talking about multiparty contracts. It's almost impossible to draw a general principle of law out of those cases because they're decided in very specific factual circumstances. In some cases, the surety won, the bonds rejected. In other cases, the surety won, the bonds assumed. So you'd have to read each one of them and then try and tease a rule out of it. But that's tough sledding. Do you see that the amicus brief is making any arguments that differ from yours? The one argument that is of consequence to me that we did not make, that the amicus brief, thank goodness, came up with, is that the surety does have some obligations to Falcon in the sense that it has to remain in the surety business. Aren't those obligations to the state more than to Falcon? I would say both. But that is my response to your question about whether the two briefs differ. I think that's it. I would say the amicus brief also goes further into the potential consequences of the ruling below, which is, for example, Mr. Phillips is saying, those two surety companies, they need to get collateral up front. Well, okay. We can do that. Or we can ask for it. Now, that may cause some problems in terms of contractors and other companies, commercial companies, that do not have the ability to put up collateral or do not want to put up collateral. So there are adverse consequences that might result. I don't want to get into a parade of horribles argument, but that might result from affirming the ruling below. Thank you very much. Thank you. Your Honor, thank you for your attention. I'm sorry. I just want an observation. Some years ago, many years ago, a very colorful chief judge of this court made the observation that nothing breathes so cold as the breath of a bankruptcy lawyer arguing over a cadaver. Ha, ha! Today you've given the light of that. I appreciate your argument and your command of the subject. That's very kind of you. Okay. We stand in recess until tomorrow. Thank you very much, gentlemen. Thank you.